*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

V

JENNIFER MARIE HAMMERLUND,

Defendant-Appellee.

FOR PUBLICATION
June 17, 2021
9:10 a.m.

No. 355120
Kent Circuit Court
LC No. 15-009717-FH

Before: BOONSTRA, P.J., and MARKEY and SERVITTO, JJ.

MARKEY, J.

In this interlocutory appeal, the prosecution appeals by delayed leave granted[1] the trial court's order that suppressed evidence and granted defendant a new trial on the basis of a violation of the Fourth Amendment. On appeal, the prosecution argues that the relevant precedent does not support application of the exclusionary rule with respect to the evidence in dispute, which is comprised of defendant's statements to the police and two breath-test results that were obtained following her arrest. Defendant was arrested inside of her home after a police officer grabbed defendant at the doorway of her house, and the two stumbled backward deeper into the interior of the home. The arresting officer acted absent a search or arrest warrant, probable cause that a felony had been committed by defendant, and absent the commission of a misdemeanor committed in his presence. Defendant never stepped outside or beyond the entrance of her home until after she was arrested and led away by the officer. The pertinent evidence was gathered after defendant exited her house. We conclude that this case demands application of the exclusionary rule to deter comparable deliberate conduct by the police in the future when contemplating making an arrest at a suspect's home. Accordingly, we affirm.

---

[1] *People v Hammerlund*, unpublished order of the Court of Appeals, entered December 16, 2020 (Docket No. 355120).

This case returns to this Court after a trip to our Supreme Court and a subsequent stop in the trial court. In *People v Hammerlund*, 504 Mich 442, 446-450; 939 NW2d 129 (2019), our Supreme Court summarized the facts of this case:

Defendant, Jennifer Marie Hammerlund, was involved in a single-vehicle accident in the early morning hours of September 30, 2015, on a highway exit ramp in Wyoming, Michigan. According to defendant, another driver cut her off, causing her to overcorrect and lose control of her car. Her vehicle scraped a cement barrier and left a dent on a metal guardrail. Defendant suffered only minor injuries; however, the car was no longer drivable. She attempted to call her insurance company and then used a rideshare service to get home. She did not report the accident to police.

Soon after, Officer Erich Staman of the Wyoming Police Department was dispatched to the scene of a reported abandoned vehicle on the shoulder of the highway off-ramp. After observing the damage to the vehicle, as well as the guardrail and cement barrier, Officer Staman requested a tow truck and conducted an inventory search. He discovered that the vehicle was registered to defendant and that it contained paperwork bearing defendant's name, so he requested that officers from the Kentwood Police Department go to defendant's home to perform a welfare check.

In the meantime, according to defendant, she returned home, found that she was "really shaken up," and drank some alcohol. She then went into her room and went to bed. Only a few minutes later, the Kentwood officers arrived and told her roommate that they wished to speak with defendant. Defendant initially declined to leave her room; however, after her roommate spoke to the officers and reported back to defendant that the police would take her into custody and arrest the roommate for harboring a fugitive if she did not appear, defendant came to the door. After that, Officer Staman arrived at the home to "make contact" with defendant.

Officer Staman testified that when he arrived at defendant's home, he stood on her porch while she remained inside, approximately 15 to 20 feet away from the front door. He acknowledged that it "didn't appear that [defendant] wanted to come to the door . . . ." And, when asked whether defendant "made it pretty clear that she wasn't coming out of the home," he agreed, stating, "It seemed that she wasn't going to come out." During their short conversation, defendant admitted to driving the car that caused the damage. When he asked defendant to produce her identification she was "reluctant" to give it to him so she passed it to him through a third party in the home. Officer Staman testified that defendant told him that she "thought [Officer Staman] might be trying to coax her out of the house."

After verifying her information, Officer Staman offered the identification card back to defendant. He explained:

And then I had to give the I.D. back to her, so I made sure I gave it back to Ms. Hammerlund. In doing that she came to the door

where I was standing and reached out to get the I.D. as I gave it back to her, at which point I grabbed her by the arm and attempted to take her into custody . . . [f]or the hit and run that she just admitted to.

He said that when defendant pulled away he grabbed her again and "the momentum" took him inside the home two to three steps where he handcuffed defendant and completed the arrest.

Following the arrest, Officer Staman placed defendant into the back of his patrol car. After she was advised of and waived her . . . rights [under *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966)], defendant provided further details about the crash, which she described to the officer as possibly a "road rage situation." Officer Staman detected a smell of intoxicants that was "moderate at best" and asked defendant if alcohol played a role in the crash. She opined that it had not, but did acknowledge drinking alcohol earlier in the night after finishing her shift as a bartender and later indicated that she thought her blood alcohol level may have been over the legal limit. When asked if she had any alcohol to drink after the accident, defendant replied, "Absolutely not." Once transported to the county jail, defendant was given two successive breath tests, which indicated a blood alcohol content over the legal limit at .22 and .21, respectively. Consequently, defendant was charged with operating while intoxicated (OWI), third offense, MCL 257.625, and failing to report an accident resulting in damage to fixtures, MCL 257.621.

Defendant filed a pretrial motion to suppress evidence and dismiss the charges. In the motion, she argued that Officer Staman had violated her Fourth Amendment rights by arresting her inside her home without a warrant and that all the evidence gathered following that arrest was subject to the exclusionary rule. The trial court denied the suppression motion, concluding that the arrest was constitutionally valid pursuant to *United States v Santana*, 427 US 38, 96 S Ct 2406, 49 L Ed 2d 300 (1976). Specifically, it found that defendant was "in the middle of a consensual discussion with Officer Staman" when she "voluntarily approached him" and "voluntarily reached out of her door." Therefore, the court concluded that Officer Staman "was legitimately in that area and it did not violate the constitution for him to effectuate an arrest by grabbing her arm when she reached out of her doorway." The fact that the officer stepped inside defendant's home to complete the arrest did not change the result, according to the trial court, because the officer was "clearly in pursuit for the arrest at that point . . . ."

The case proceeded to trial. Defendant's theory of the case was that she became intoxicated only after the accident. However, she acknowledged that she did not tell any of the officers that she drank when she got home. Defendant's statements made to Officer Staman in his patrol car, as well as her blood-alcohol-content test results, were admitted at trial. After a jury trial, defendant was convicted as charged, and she was sentenced to five years' probation and four months in jail for violating MCL 257.625 and to a concurrent term of 60 days in jail for violating MCL 257.621.

Defendant appealed, continuing to challenge the trial court's denial of her motion to suppress. The Court of Appeals, like the trial court, concluded that the arrest was constitutional under *Santana*, 427 US at 42, and that the trial court had not erred by denying defendant's motion. *People v Hammerlund*, unpublished per curiam opinion of the Court of Appeals, issued October 17, 2017 (Docket No. 333827). [Citation omitted.]

The Michigan Supreme Court held that defendant's arrest violated her Fourth Amendment right to be free from unreasonable governmental intrusion into her home, summarizing its holding as follows:

> Officer Staman completed defendant's arrest inside her home, the place where the Constitution most protects her freedom from unreasonable governmental intrusion. Defendant was not subject to public arrest because she remained inside, she maintained her reasonable expectation of privacy, and her act of reaching out to retrieve her identification did not expose her to the public "as if she had been standing completely outside her house," *Santana*, 427 US at 42. In addition, the circumstances were insufficient to justify the hot-pursuit exception to the warrant requirement. Because the arrest was completed across the Fourth Amendment's "firm line at the entrance of the home," it was presumptively unreasonable. *Payton*[*v New York*], 445 US [573,] 586, 590 [; 100 S Ct 1371; 63 L Ed 2d 639 (1980)]. It is the prosecution's burden to overcome this presumption, [*People v*] *Oliver*, 417 Mich [366,] 380[; 338 NW2d 167 (1983)], and when the government's interest is to arrest for a minor offense, the presumption that a warrantless entry into a home was unreasonable is difficult to rebut, *Welsh*[ *v Wisconsin*], 466 US [740,] 750[; 104 S Ct 2091; 80 L Ed 2d 732 (1984)]. The prosecution failed to overcome this presumption, and the trial court and the Court of Appeals erred by concluding otherwise. [*Hammerlund*, 504 Mich at 463.]

On the basis of this conclusion, our Supreme Court remanded the case to the trial court with instructions that the court address the separate issue regarding whether to apply the exclusionary rule. *Id.* Relevant to our analysis, the Supreme Court noted that "the facts that were known to Officer Staman at the time of the arrest were not sufficient to establish probable cause for OWI or any other identified felony." *Id.* at 453 n 5. The Court further noted that the "failure to report an accident resulting in damage to fixtures is a 90-day misdemeanor[;] . . . therefore, Officer Staman was not statutorily authorized to arrest defendant [under] . . . MCL 764.15(1)(d)." *Id.* at n 4.

Following the Supreme Court's decision and remand to the trial court, defendant moved both to suppress her statements and the breath-test results under the exclusionary rule and for a new trial. The trial court granted the motion, suppressing the evidence and ordering a new trial. The prosecution now appeals that order.

"Application of the exclusionary rule to a constitutional violation is a question of law that is reviewed de novo." *People v Frazier*, 478 Mich 231, 240; 733 NW2d 713 (2007). The Fourth Amendment of the United States Constitution provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

With respect to the protection against unreasonable searches and seizures, "[t]he Michigan Constitution, Const 1963, art 1, § 11, provides coextensive protection to that of its federal counterpart." *Hammerlund*, 504 Mich at 451 n 3.

The exclusionary rule, which provides for the suppression of illegally seized evidence, reaches not only primary evidence that is obtained as a direct result of an illegal search or seizure, but also evidence that is discovered later and found to be derivative of the illegality, i.e., fruit of the poisonous tree. *People v Randolph*, 502 Mich 1, 16 n 31; 917 NW2d 249 (2018). In other words, the exclusionary rule forbids the use of direct and indirect evidence acquired through governmental misconduct, such as an illegal search by the police. *Id.*

The Fourth Amendment says nothing about excluding evidence at trial when its commands are violated; rather, the exclusionary rule is a prudential doctrine created by the United States Supreme Court to compel respect for the prohibition against unreasonable searches and seizures. *Davis v United States*, 564 US 229, 236; 131 S Ct 2419; 180 L Ed 2d 285 (2011). The sole purpose of the exclusionary rule is to deter future Fourth Amendment violations. *Id.* at 236-237. Where suppression would fail to yield any appreciable deterrence, exclusion of the evidence is unwarranted. *Id.* at 237. The deterrence benefits of exclusion vary with the culpability of a police officer's conduct. *Id.* at 238. When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs to society in excluding evidence of criminal wrongdoing. *Id.* When, however, the police act with an objectively reasonable good-faith belief that their conduct falls within the confines of the law or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force and exclusion serves no valid purpose. *Id.*

As discussed, our Supreme Court has already decided that defendant's arrest violated the Fourth Amendment. At issue in this appeal is whether evidence obtained following that arrest— namely, defendant's statements made to Officer Staman in his patrol car and the results of her breath tests—must be suppressed under the exclusionary rule. The prosecution argues that suppression is foreclosed by the United States Supreme Court's decision in *New York v Harris*, 495 US 14; 110 S Ct 1640; 109 L Ed 2d 13 (1990), which we shall address momentarily.

First, in *Payton*, 445 US at 576, the United States Supreme Court held "that the Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." (Citations omitted.) The Court emphasized that the right of a person to retreat into his or her home and there be free from unreasonable governmental intrusion stands at the very core of the Fourth Amendment. *Id.* at 589-590. "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house [and,] [a]bsent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590.

In this case, defendant was standing at the entrance of her home in the doorway when she extended her hand beyond the threshold of the doorway solely in order to retrieve her identification card from Officer Staman. The record clearly indicated that defendant had no intention or desire whatsoever to voluntarily step outside of her home, and she even informed Officer Staman of her belief that he was trying to coax her out of the house. Officer Staman grabbed her arm in an attempt to arrest her, but defendant pulled away, forcing Officer Staman to again grab for her arm. The momentum of their movements carried Officer Staman two or three steps inside the home where he handcuffed defendant. We are thus addressing a situation in which defendant never stepped outside or beyond the entrance of her house and was arrested inside of her home. Although, ostensibly, Officer Staman did not intentionally or deliberately enter the home, it is quite clear that he intended to arrest defendant at her home absent a warrant by engaging in a deliberate effort to draw her near the door where he could physically grab her and pull her out of the house. And it was Officer Staman's actions that set into motion the events that led to defendant's arrest inside the home.

Under these circumstances, we conclude that Officer Staman exhibited deliberate disregard for defendant's Fourth Amendment rights. We also find that the deterrent value of exclusion is strong and outweighs the resulting cost to society. Absent application of the exclusionary rule, we would effectively be giving our approval to conduct in which, taken to its logical end, police officers grab and pull suspects through open doors and windows, even though the suspects are squarely inside their homes and regardless whether an officer ends up inside a home as a result of a tussle at the door or window. Were we to allow the admission of the evidence in this case, there would be no deterrence to such behavior. And the opinion in *Harris* does not demand a different result. Indeed, *Harris* fully supports our holding.

In *Harris*, respondent Harris was suspected of having committed a murder, and the police entered his home without first procuring a warrant although the police did have probable cause to believe that Harris had indeed committed the murder. Inside the home, the police read Harris his *Miranda* rights and obtained a confession to the murder. Harris was arrested and taken to the police station, where he signed a written inculpatory statement after having been Mirandized a second time. Subsequently, Harris was again Mirandized before participating in a videotaped incriminating interview even though he had indicated that he wanted the interview to end. The New York trial court, pursuant to *Payton*, suppressed the first statement made in the home, along with the third statement for reasons irrelevant to our analysis, but the court admitted the written statement made at the police station. Harris was convicted of second-degree murder. The New York Court of Appeals reversed, concluding that the second statement was inadmissible because its connection to the arrest was not sufficiently attenuated, thereby constituting indirect fruits of an illegal search or arrest that had to be suppressed. *Harris*, 495 US at 15-17.

The Supreme Court "decline[d] to apply the exclusionary rule . . . because the rule . . . was not intended to grant criminal suspects, like Harris, protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime." *Id.* at 17. The Court further indicated that "[b]ecause the officers had probable cause to arrest Harris for a crime, Harris was not unlawfully in custody when he was removed to the station house, given *Miranda* warnings, and allowed to talk." *Id.* at 18. The *Harris* Court observed:

For Fourth Amendment purposes, the legal issue is the same as it would be had the police arrested Harris on his doorstep, illegally entered his home to search for evidence, and later interrogated Harris at the station house. Similarly, if the police had made a warrantless entry into Harris' home, not found him there, but arrested him on the street when he returned, a later statement made by him after proper warnings would no doubt be admissible.  [*Id.*]

The Court distinguished several cases in which the evidence obtained from a criminal defendant following arrest was suppressed because the police lacked probable cause. *Id.* at 18-19. The Supreme Court explained that those cases stood "for the familiar proposition that the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." *Id.* at 19.  Stated otherwise, the challenged evidence was the product of illegal governmental activity. *Id.*  And the illegality was the absence of probable cause, with the wrong consisting of the police exercising control of the defendant's person at the point when the challenged evidence came into existence, i.e., wrongful detention. *Id.*  The Court noted that Harris's "statement taken at the police station was not the product of being in unlawful custody." *Id.*  The Supreme Court reasoned that "the police had a justification to question Harris prior to his arrest; therefore, his subsequent statement was not an exploitation of the illegal entry into Harris'[s] home." *Id.*

Harris's stationhouse statement was deemed admissible "because Harris was in legal custody . . . and because the statement, while the product of an arrest and being in custody, was not the fruit of the fact that the arrest was made in the house rather than someplace else." *Id.* at 20.  The United States Supreme Court, concluding its opinion, stated:

> The warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded, as it should have been; the purpose of the rule has thereby been vindicated. We are not required by the Constitution to go further and suppress statements later made by Harris in order to deter police from violating *Payton*. As cases considering the use of unlawfully obtained evidence in criminal trials themselves make clear, it does not follow from the emphasis on the exclusionary rule's deterrent value that anything which deters illegal searches is thereby commanded by the Fourth Amendment. Even though we decline to suppress statements made outside the home following a *Payton* violation, the principal incentive to obey *Payton* still obtains: the police know that a warrantless entry will lead to the suppression of any evidence found, or statements taken, inside the home. If we did suppress statements like Harris'[s], moreover, the incremental deterrent value would be minimal. Given that the police have probable cause to arrest a suspect in Harris'[s] position, they need not violate *Payton* in order to interrogate the suspect. It is doubtful therefore that the desire to secure a statement from a criminal suspect would motivate the police to violate *Payton*. As a result, suppressing a station house statement obtained after a *Payton* violation will have little effect on the officers' actions, one way or another.
>
> We hold that, where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant

outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*. [*Harris*, 495 US at 20-21 (quotation marks and citation omitted).[2]].

As best we can construe *Harris*, we conclude that it stands for the proposition that evidence obtained or gathered inside a house is subject to the exclusionary rule when there has been an unlawful governmental intrusion under the Fourth Amendment. But if the evidence were subsequently obtained or gathered outside the house, exclusion is not appropriate if there existed probable cause to arrest the defendant or if the defendant was not illegally or wrongfully detained, as assessed by information known to the police when arriving at a home. On the other hand, if probable cause is lacking or if a detention is otherwise unlawful or wrongful, the fruits of the search or arrest must be suppressed when they bear a sufficiently close relationship to the underlying illegality.

In this case, Officer Staman did not have probable cause to arrest defendant for OWI or any other felony. We are bound by our Supreme Court's determination that "the facts that were known to Officer Staman at the time of the arrest were not sufficient to establish probable cause for OWI or any other identified felony." *Hammerlund*, 504 Mich at 453 n 5. This was a legal determination by the Supreme Court, and one made by a body superior to this Court. "If an appellate court has passed *on a legal question* and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain materially the same." *People v Fisher*, 449 Mich 441, 444-445; 537 NW2d 577 (1995) (quotation marks, citation, and brackets omitted). Furthermore, "[w]hen a court of last resort intentionally takes up, discusses and decides a question germane to, though not necessarily decisive of, the controversy, such decision is not a dictum but is a judicial act of the court which it will thereafter recognize as a binding decision." *People v Kevorkian*, 447 Mich 436, 487 n 65; 527 NW2d 714 (1994) (quotation marks, citations, and emphasis omitted). The prosecution's arguments to the contrary are entirely unavailing.

Additionally, as observed earlier, the *Hammerlund* Court noted that the "failure to report an accident resulting in damage to fixtures is a 90-day misdemeanor[;] . . . therefore, Officer Staman was not statutorily authorized to arrest defendant [under] . . . MCL 764.15(1)(d)." *Hammerlund*, 504 Mich at 453 n 4. MCL 764.15 provides, in relevant part, as follows:

> (1) A peace officer, without a warrant, may arrest a person in any of the following situations:

> (a) A felony, misdemeanor, or ordinance violation is committed in the peace officer's presence.

* * *

---

[2] This Court adopted *Harris* in *People v Dowdy*, 211 Mich App 562, 568-70; 536 NW2d 794 (1995).

(d) The peace officer has reasonable cause to believe a misdemeanor punishable by imprisonment for more than 92 days . . . has been committed and reasonable cause to believe the person committed it.

Accordingly, Officer Staman did not have a legal basis to arrest defendant for a 90-day misdemeanor committed outside his presence. Thus, detaining defendant was wrongful and unlawful. We recognize that there was probable cause that defendant committed the misdemeanor and that the unlawfulness of the arrest relative to the misdemeanor was statutory and not constitutional. Nevertheless, the bottom line is that the arrest and detention were against the law. Defendant should not have been taken into custody.

In sum, probable cause was lacking, and the detention was otherwise unlawful or wrongful. Because Officer Staman lacked probable cause to arrest defendant for a felony and lacked the legal authority to arrest defendant for a misdemeanor, the case is easily distinguishable from *Harris*, falling into the class of cases that the *Harris* Court found distinguishable and that had properly applied the exclusionary rule. The statements defendant made to Officer Staman and the two breath tests bore a sufficiently close relationship to the underlying illegality, in that the evidence was the direct product of defendant being in unlawful custody. Defendant was illegally arrested and almost immediately made statements to Officer Staman in the back of his patrol car. And soon thereafter she submitted to the two breath tests at the county jail. We hold that the trial court did not err when it applied the exclusionary rule.

The prosecution also argues that the trial court abused its discretion when it granted defendant a new trial. Again, we disagree. This Court reviews for an abuse of discretion a trial court's decision on a motion for a new trial. *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Bergman*, 312 Mich App 471, 483; 879 NW2d 278 (2015) (quotation marks and citation omitted).

MCR 6.431 governs motions for new trial in criminal cases and subsection (B) provides as follows:

> On the defendant's motion, the court may order a new trial on any ground that would support appellate reversal of the conviction or because it believes that the verdict has resulted in a miscarriage of justice. The court must state its reasons for granting or denying a new trial orally on the record or in a written ruling made a part of the record.

In the trial court's estimation, the breath test results were critical to the issue of intoxication, and the statements defendant made denying drinking after the accident were vital to the issue of when she became intoxicated. The prosecution argues that the trial court failed to identify the particular ground that would have supported appellate reversal and did not state whether it believed that the verdict constituted a miscarriage of justice. It is unclear how the suppression of "critical" evidence would not, **on** appeal, have warranted reversal. And a verdict supported by evidence deemed critical that should have been suppressed would certainly render the verdict a miscarriage of justice. Even in its argument that there was no miscarriage of justice, the prosecution explicitly relies on the suppressed evidence. If anything, the prosecution's argument appears to be an

admission that the trial court's grant of a new trial was proper.  Under the circumstances of this case wherein there was a Fourth Amendment violation and critical evidence was presented that should have been suppressed under the exclusionary rule, a new trial is wholly warranted.

We affirm.


/s/ Jane E. Markey
/s/ Deborah A. Servitto